**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. ____________________**

FEINGOLD MORGAN SANCHEZ LLC, FEINGOLD LLC, DAVID FEINGOLD, AND E-CONSULTING GLOBAL GROUP, LLC

*Plaintiffs*,

v.

INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY, UNITED STATES OF AMERICA, HUIWEN AUDREY XI, AND CINDY CHATELAIN,

*Defendants*.

**COMPLAINT**

**(Jury Trial Demanded)**

As then Deputy Solicitor General for the Department of Justice, John G. Roberts, Jr. astutely contended at oral argument in *Freytag v. Comm'r*, 501 U.S. 868, 911 (1991), the United States Tax Court "remains in the executive branch." (Tr. of Oral Arg. at 50:15-51:6). Thirty-five years later, Chief Justice John G. Roberts, Jr. delivered the Supreme Court's decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026).

While *Slaughter* involved the Federal Trade Commission, its logic provides that Tax Court judges are subject to at-will presidential removal, meaning the adjudicator (the Tax Court judge) and the prosecutor (the Internal Revenue Service) are aligned under the same executive authority, which thereby deprives the taxpayer of a neutral adjudicator in the Tax Court. The issue of the application of *Slaughter*'s logic as to the Tax Court came up during oral argument in *Slaughter*. The Supreme Court, however, opted to leave this issue for "another day." That day has now come.

Plaintiffs Feingold Morgan Sanchez LLC ("FMS"), Feingold LLC ("FLLC"), David Feingold ("Feingold") and E-Consulting Global Group, LLC ("E-Consulting") (collectively, "Plaintiffs") complain of the Internal Revenue Service ("IRS"), Department of the Treasury ("DOT"), the United States of America (collectively, "Government"), Huiwen Audrey Xi ("Xi") and Cindy Chatelain ("Chatelain") (collectively, "Defendants") as follows.

## INTRODUCTION

1. This case arises from Defendants' unconstitutional, unlawful and retaliatory campaign against Plaintiffs. Government retaliation unfortunately will not surprise many American taxpayers. It is commonly understood that if a taxpayer pushes back against the IRS, retribution will likely follow. This, of course, is not what the Founders intended or what the law permits. It has, however, been the experience of many American taxpayers, including Plaintiffs.

2. For brief background, Feingold, FMS and FLLC have sued the Government for its unlawful and unconstitutional retaliatory campaign against them. In short, Feingold had the audacity to complain to the Commissioner of the IRS (at the time) concerning illegal conduct of an agent of the IRS, which led to an agent's removal. That removal and complaint triggered a fierce campaign of retaliation against Plaintiffs.

3. Among other things, the Government has issued unconstitutional Notices of Deficiency (Letter 531 (Rev. 9-2022) ("Unconstitutional Notices")) to Feingold, FMS and FLLC asserting civil fraud penalties without providing access to a jury trial, which is unconstitutional. *See, e.g., Sec. & Exch. Comm'n v. Jarkesy,* 603 U.S. 109, 140 (2024). The Unconstitutional Notices are the subject of a case Feingold, FMS and FLLC filed in February 2026 that is pending in the United States District Court for the District of South Carolina ("South Carolina Case"). A copy of the detailed operative complaint in the South Carolina Case is attached hereto as **Exhibit 1**.

4. As noted in the South Carolina Case, after receiving the Unconstitutional Notices, Feingold, FMS and FLLC, out of an abundance of caution and to exercise the unconstitutionally limited option afforded by the Unconstitutional Notices, filed an action in the Tax Court without access to a jury trial ("Tax Court Case"). In sum, when the IRS issued the Unconstitutional Notices, which did not allow Feingold, FMS and FLLC access to a jury trial, Feingold, FMS and FLLC pursued an action in the juryless Tax Court to at least preserve the unconstitutionally limited option to contest the claims of fraud against them, as that was the only option the IRS gave them. The Unconstitutional Notices wrongly state, however, that the Tax Court is the only forum for the dispute.

5. In the Tax Court Case, the IRS has made allegations concerning E-Consulting and further alleges that E-Consulting is an alter ego of Feingold. *See, e.g., Feingold v. Commissioner*, United States Tax Court, Docket No. 19354-24, Doc. 103 at ¶ 8 (alleging that Plaintiff is an alter ego of Mr. Feingold). By bringing E-Consulting into the Tax Court Case, the IRS affirmatively chose to pursue its meritless claims against E-Consulting there.

6. Despite all this, Chatelain – an IRS employee – recently issued a first-party Form 2039 summons on E-Consulting ("Unconstitutional Summons") targeting the same 2020 tax year at issue in the Unconstitutional Notices and listing E-Consulting as the primary party. Indeed, in addition to the unconstitutional Tax Court Case – in which again the IRS claims E-Consulting is the alter-ego of Feingold – Chatelain also opted to pursue E-Consulting via the Unconstitutional Summons. Two unconstitutional acts do not make a constitutional act.

7. In addition, despite claiming in the Tax Court that E-Consulting is an alter ego of Feingold, the Unconstitutional Summons did not seek to depose Feingold. Instead, Chatelain sought to depose Feingold's wife. Tellingly, despite making allegations about E-Consulting in the

unconstitutional Tax Court Case, the IRS did not seek to depose Mrs. Feingold there (as it would not be permitted), much less in the constitutionally proper forum for claims of fraud (one with access to a jury trial).

8. The Unconstitutional Summons was not used as a neutral examination tool but as an obvious attempt by the Government to circumvent Feingold's constitutional rights and gain leverage against him.

9. The IRS had already advanced theories in the Tax Court Case seeking to attribute amounts allegedly received by E-Consulting to Feingold personally. Instead of conducting discovery in a constitutional forum with access to a jury trial (as it should), however, Chatelain sought to depose Feingold's wife pursuant to the Unconstitutional Summons.

10. In response to Chatelain's act, E-Consulting filed suit in this District (Case No. 1:26-25209-RAR). Only after that did the Government withdraw the Summons, seemingly acknowledging what E-Consulting alleged is true and that Chatelain's act was *ultra vires*. It cannot be asserted enough, once E-Consulting filed an action in an Article III court, the Government quickly withdrew its summons action. Chatelain acted unconstitutionally and apparently without authority.

11. In June 2026, the United States Supreme Court decided *Trump v. Slaughter*, 146 S. Ct. 2283 (2026) holding that officers exercising executive power must be removable at will by the President. The history of the Tax Court, legal authorities, and constitutional principles indicate that Tax Court judges exercise executive power and authority as part of the Executive Branch of government. Applying *Slaughter*'s logic, judges of the Tax Court are subject to at-will presidential removal, which aligns the adjudicator (the Tax Court judge) and the prosecutor (the IRS) under the same executive authority.

12. When taxpayers, like Plaintiffs here, must litigate a disputed tax deficiency in the Tax Court before an adjudicator who is structurally accountable to the same executive as the prosecuting agency, the proceeding fails due process's bedrock requirement of a neutral decisionmaker, creating an impermissible and unconstitutional risk of bias that demands declaratory and injunctive relief.

13. And it is more than just risk here. The risk of bias has become reality. Just recently, two non-parties to the Tax Court Case were ordered to sit for depositions, despite neither of them having been properly served with a subpoena or received proper notice (they received just two business days notice). In that same order, valid constitutional arguments concerning the Tax Court were dismissively labeled improper without explanation. The Tax Court's position on this issue is clear: How dare a taxpayer question the improper use of executive branch judges overseeing the executive branch IRS post-*Slaughter*? The Government and the Tax Court's apparent answer is one of constitutional avoidance, which, of course, is not the correct answer.

14. This similar problem has arisen with other agencies, such as the SEC after *Jarkesy* (which required a jury trial in an Article III court for fraud claims by the SEC). In light of *Jarkesy*, the SEC simply started to bring its fraud claims in Article III courts, as opposed to the administrative court (as it used to).

15. The reason for the judicial branch is to, among other things, check the Government. Despite *Slaughter*, the Government refuses to accept the Supreme Court's clear logic and that the judicial branch is to keep it in check. Instead, it proceeds in the structurally flawed Tax Court.

16. Worse, the structural failure of the Tax Court highlighted by *Slaughter*'s clear logic is also coupled with the outrageous, *ultra vires* conduct of two rogue IRS employees: Chatelain and Xi. As explained further below, these two individuals have grossly exceeded their authority.

Their mission is clear. It is not to execute their lawful duties as IRS employees. It is something more: To unequivocally destroy Feingold, his family, his companies, his business associates and anyone else associated with Feingold. While Chatelain and Xi each seemingly believe they can get away with anything, rogue, *ultra vires* missions of destruction of an American taxpayer and those close to him are not protected acts.

## Parties

17. FMS is a Florida company with its principal place of business in Greenville, South Carolina. FMS is in the business of real estate development, investment oversight, and related services.

18. FLLC is a Wyoming company with its principal place of business in Sheridan, Wyoming. FLLC is in the business of real estate development, investment oversight, and related services.

19. Feingold is a citizen and resident of the State of Florida.

20. E-Consulting is a limited liability company with its principal place of business in this District.

21. The IRS is an agency of the United States of America that is responsible for administration and enforcement of provisions of the Internal Revenue Code, as well as other IRS rules, regulations, policies, procedures, and practices.

22. The DOT is an Executive Department of the United States of America that oversees the IRS.

23. The IRS, DOT and the United States of America are proper defendants.

24. Upon information and belief, Xi is a citizen and resident of the State of Georgia.

25. Upon information and belief, Chatelain is a citizen and resident of the State of Florida.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the United States Constitution ("U.S. Constitution") and the laws of the United States, including, but not limited to, violations of the Fifth Amendment.

27. Neither the Anti-Injunction Act, 26 U.S.C. § 7421, nor the "federal taxes" carveout from the Declaratory Judgment Act, 28 U.S.C. § 2201, bar this action because it is not being brought for the purpose of restraining the assessment or collection of any tax. Instead, this action is being brought to uphold the fundamental and long-standing constitutional right to a neutral process under the Due Process Clause.

28. Venue is proper in this District because (i) Feingold resides in this District, (ii) E-Consulting's principal place of business is in this District and (iii) Plaintiffs transact significant business here through their investments and operations. Therefore, a substantial part of Plaintiffs' business gives rise to the claims in this District.

29. This Court has personal jurisdiction over Defendants because (i) the IRS maintains an office in this District and regularly conducts operations here and (ii) Defendants' misconduct detailed herein has directly affected Plaintiffs' operations, a substantial part of which are based in this District.

30. An actual, ongoing controversy exists between the parties regarding the constitutionality of the Tax Court adjudication structure as applied to Plaintiffs' pending Tax Court Case. The claim is ripe, and Plaintiffs have standing because Plaintiffs are presently subject to

adjudication before the Tax Court and face imminent, concrete injury to constitutional interests that is redressable by this Court.

## Factual Allegations

### I. *Trump v. Slaughter*

31. The Constitution creates three types of power, each separated in its own branch of government, to maintain a separation of powers and a system of checks and balances – the Executive Branch, the Legislative Branch, and the Judicial Branch.

32. The Constitution places the executive power in the President of the United States.

33. *Slaughter* is a landmark Supreme Court decision in which a 6-3 majority, authored by Chief Justice Roberts, held that the Federal Trade Commission's ("FTC") statutory for-cause removal protection for its Commissioners[1] violates "the separation of powers enshrined in the Constitution." *Slaughter*, 146 S. Ct. at 2291. The Court further held that FTC Commissioners serve as subordinates of the President and are therefore subject to at-will removal. In reaching this conclusion, the Court expressly overruled *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), a nearly century-old precedent that had served as the constitutional foundation for the modern system of independent federal agencies.

34. The *Slaughter* majority examined the U.S. Constitution's text, history, and structure and determined that they "taught that the President had to be able to remove those who fail to live up to their duties, lest he fail to live up to his." *Slaughter*, 146 S. Ct. at 2295.

---

[1] The FTC Act expressly limits the President's ability to dismiss Commissioners to situations involving "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. §41.

35. The majority opinion in *Slaughter* highlighted that "[n]early 250 years ago, the Framers decided to vest '[t]he executive Power' in one person—'a President of the United States of America.'" *Trump v. Slaughter*, 146 S. Ct. 2283, 2291 (2026) (quoting Art. II, § 1, cl. 1).

36. The *Slaughter* majority acknowledged that this "choice was not made lightly." *Slaughter*, 146 S. Ct. at 2291. "Within living memory were the 'long train of abuses and usurpations' of a King who reigned as 'a Tyrant.'" *Id*. (quoting Declaration of Independence, ¶¶ 2, 30). "Indeed, several delegates to the Constitutional Convention pushed for a multimember council instead of 'unity in the Executive magistracy,' which they feared would serve as 'the foetus of monarchy.'" *Slaughter*, 146 S. Ct. at 2291 (quoting 1 Records of the Federal Convention of 1787, p. 66 (M. Farrand ed. 1911) (Farrand's Records) (E. Randolph)).

37. The majority in *Slaughter* emphasized that "unity won out. Our Constitution's drafters knew from experience that a 'plurality in the executive'—the model in use by most States at the time—not only 'diminishe[s]' the 'activity, secrecy, and dispatch' necessary to ensure 'good government' but 'tends to conceal faults and destroy responsibility.'" *Slaughter*, 146 S. Ct. at 2291 (quoting The Federalist No. 70, pp. 423–424, 427 (C. Rossiter ed. 1961) (A. Hamilton)). "With just one President in charge, they reasoned, there would be no doubt 'on whom the blame or the punishment of a pernicious measure . . . ought really to fall.'" *Slaughter*, 146 S. Ct. at 2291 (quoting The Federalist No. 70, p. 428).

38. The *Slaughter* majority grounded its decision in the text and structure of Article II of the U.S. Constitution, which vests the executive power in the President and instructs him to take care that the laws be faithfully executed. *See Slaughter*, 146 S. Ct. at 2292-93. The Supreme Court reasoned that vesting executive power in a single person "was not to suggest that he could execute the laws alone and unaided," but it was to establish a hierarchy — a Chief Magistrate with whom

the buck stops, and below him various assistants or deputies who derive their offices from his appointment and remain subject to his superintendence. *Id*. at 2293. "To remain accountable to the President, those officers must be removable by the President." *Id*.

39. The Supreme Court explained that this aspect of the President's power was confirmed in the U.S. Constitution's first year during the so-called Decision of 1789, which was the First Congress's resolution of the question of presidential removal power during debates over the establishment of the Department of Foreign Affairs. *See id*. at 2295-2296. James Madison argued that removal was part of the executive power vested in the President, which the legislature has no right to diminish or modify. *See id*. at 2296. Madison further explained that it is only with the power of removal that the chain of dependence can be preserved — the lowest officers, the middle grade, and the highest made to depend, as they ought, on the President, and the President on the community. *See id*. The Supreme Court characterized this historical episode as the beginning of a "regular course of practice that liquidated and settled the President's power of removal." *Id*. at 2295 (citation and internal quotations omitted).

40. The majority in *Slaughter* examined how "[e]arly Presidents of all persuasions, too, hewed to the Decision of 1789," including George Washington, who "saw it as his 'indispensable duty' to remove officers who failed to live up to his expectations," *id*. at 2298 (quoting 36 Writings of George Washington 216 (1941)), as well as Washington's Cabinet, who took "the stance that the ability to 'remove from office' was 'an essential attribute of Executive Power.'" *Slaughter*, 146 S. Ct. at 2297 (quoting 20 Papers of George Washington: Presidential Series 355, 357, n. 2 (D. Hoth & W. Ferraro eds. 2019)).

41. So did the first President Adams, Jefferson, Madison, Monroe, and the second President Adams. *See Slaughter*, 146 S. Ct. at 2297. "And so did Jackson—much to Congress's

dismay. Unlike his predecessors, who (except for Jefferson) utilized their removal power sparingly, Jackson fired hundreds 'of subordinates for personal and partisan reasons.'" *Id.* (quoting L. White, The Jacksonians: A Study in Administrative History, 1829–1861, p. 33 (1954) (White)). "But even Jackson's most vehement critics acknowledged that he had the power to do as he pleased." *Slaughter*, 146 S. Ct. at 2297.

42. The *Slaughter* majority did not mince words, stating: "What text, history, and structure settle, our precedent confirms—the President may remove his subordinates at will." *Id.*

43. The Supreme Court's majority in *Slaughter* explained that "[t]wice in the 19th century, [they] reaffirmed what the First Congress had held," pointing to *Ex parte Hennen*, 38 U.S. 230 (1839), in which the Supreme Court stated that "it was very early adopted, as the practical construction of the Constitution," that the power "to remove, where the tenure of the office was not fixed by the Constitution," was "vested in the President alone," *Slaughter*, 146 S. Ct. at 2298 (quoting *Hennen*, 13 Pet. at 259), as well as to *Parsons v. United States*, 167 U.S. 324 (1897), in which the Supreme Court explained that the "decision of Congress in 1789, and the universal practice of the Government under it" has "settled the question beyond any power of alteration." *Slaughter*, 146 S. Ct. at 2298 (quoting *Parsons*, 167 U.S. at 330).

44. The majority in *Slaughter* focused on the Supreme Court's landmark decision in *Myers v. United States*, 272 U.S. 52 (1926). "In a scholarly opinion, Chief Justice Taft rejected [the postmaster's] suit and reaffirmed the President's power to fire his subordinates at will." *Slaughter*, 146 S. Ct. at 2298. "That power arose, he wrote for the Court, from the Constitution's text, history, and structure, just as the First Congress had held in 1789." *Id.* (citing *Myers*, 272 U.S. at 136). "'The vesting of the executive power in the President was essentially a grant of the power to execute the laws,' Chief Justice Taft explained." *Slaughter*, 146 S. Ct. at 2298 (quoting *Myers*,

272 U.S. at 117). "'As he is charged specifically to take care that [the laws] be faithfully executed, the reasonable implication,' he continued, 'was that as part of his executive power' he must be able to 'remov[e] those for whom he can not continue to be responsible.'" *Id*. "'Mr. Madison and his associates' made this same point, the Chief Justice noted, and they 'dwelt at length upon the necessity there was for construing Article II to give the President the sole power of removal in his responsibility for the conduct of the executive branch.'" *Id*.

45. The central doctrinal move in *Slaughter* was the express overruling of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in which the Supreme Court had upheld the FTC's for-cause removal provision on the theory that the FTC was a quasi-legislative and quasi-judicial body that occupied no place in the executive department, and that its duties were performed without executive leave and must be free from executive control. *See Slaughter*, 146 S. Ct. at 2300. The *Humphrey's* Court distinguished *Myers* on the ground that a postmaster was a purely executive officer, while FTC Commissioners performed duties that were neither political nor executive, but predominantly quasi-judicial and quasi-legislative. *See id*.

46. The *Slaughter* majority found that *Humphrey's* framework had not withstood the test of time. *See Slaughter*, 146 S. Ct. at 2300-2302. "'[I]t is hard to dispute that the powers of the FTC,' even 'at the time of *Humphrey's Executor*,' [the Supreme Court] explained in 1988, 'would at the present time be considered 'executive,' at least to some degree.'" *Id*. at 2301 (quoting *Morrison v. Olson*, 487 U.S. 654, 690 n.28 (1988)). The majority in *Slaughter* concluded bluntly that "*Humphrey's* has for decades been a result in search of a rationale." *Slaughter*, 146 S. Ct. at 2302. The Supreme Court held that "all that is left of *Humphrey's* is its observation that an agency that 'exercises no part of the executive power' need not fall within the rule of Presidential

removal." *Id*. (citations omitted). The Court went on to state in no uncertain terms, "If anything more *is* left of *Humphrey's*, we overrule it." *Id*.

47. The Supreme Court's majority in *Slaughter* emphasized, "When an agency 'executes' a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it." *Id*.

48. In *Slaughter*, the majority ultimately held, "With these principles in mind, this is not a close case. The FTC's for-cause removal provision violates the separation of powers. In its present form, the FTC enforces and administers some 80 statutes, which cover almost every facet of our Nation's economy. The tasks it undertakes are the very essence of execution of the law—precisely the President's constitutional role." *Id*. at 2304 (citation and internal quotations omitted).

49. But the Supreme Court in *Slaughter* also noted that it had "no occasion today to define the bounds of what such [executive] power entails," nor did it "determine the fate of officials not before us" other than the FTC. *Id*. at 2306.

50. The *Slaughter* majority expressly stated, "In particular, as the Solicitor General recognized at argument, the permissibility of tenure protections for the judges of 'non-Article III courts,' such as the Tax Court and the Court of Federal Claims, is not 'presented' or 'briefed' in this case and poses a 'different set of questions.' We leave those questions for another day." *Id*. (quoting Tr. of Oral Arg. at 15, 28).

51. Therefore, the Supreme Court in *Slaughter* did not hold that Tax Court judges are exempt from the removal power. Instead, it simply declined to decide this question at that time and saved it for "another day." *Id*. The Court's explicit reservation of the Tax Court question signals that the issue is live, unresolved, and important.

52. The day to address this serious issue of the Tax Court, alluded to by the majority in *Slaughter*, has now come.

53. The Tax Court's history, legal authorities, and constitutional principles, which are discussed in detail below, demonstrate that Tax Court judges exercise executive power and authority as part of the Executive Branch of Government. As a result, following *Slaughter*, Tax Court judges necessarily must be controlled by the President, in whom executive power is vested, and they are, therefore, subject to at-will presidential removal.

54. Likewise, the IRS is an agency of the Executive Branch whose leadership is appointed by and answerable to the President.

55. Thus, the same President that appoints and removes Tax Court judges also appoints and removes IRS officials. That is, both Tax Court *judges* and the IRS—a *party* to Tax Court litigation against a private taxpayer—are answerable to the same President. This necessarily raises the objective concern that this structural arrangement creates an unconstitutionally intolerable potential for bias.

56. Simply put, this structure violates due process's basic requirement of a neutral adjudicator when taxpayers like Plaintiffs have to litigate a disputed tax deficiency in the Tax Court, and it cannot be allowed to stand.

*A. <u>Tax Court History</u>*

57. The Revenue Act of 1924 (the "1924 Act") established the "Board of Tax Appeals" (the "Board") as "an independent agency in the executive branch of the Government."

58. Under the 1924 Act, members of the Board ("Board Members") were appointed by the President, with the advice and consent of the Senate, to ten-year terms.

59. The 1924 Act provided that Board Members were removable by the President "for inefficiency, neglect of duty, or malfeasance in office, but for no other reason." [2]

60. In 1926, Congress extended the Board Members' terms to twelve years, required "notice and opportunity for a public hearing" before the President could remove a Board Member for cause, and made decisions of the Board reviewable by the circuit courts of appeals.

61. Then, "no one suggested that body exercised the 'judicial power.' [The Supreme Court] held just the opposite:

> 'The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided.'

*Freytag v. Comm'r*, 501 U.S. 868, 911 (1991) (Scalia, J., concurring in part and concurring in the judgment) (quoting *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 725 (1929) (Taft, C.J.)).

62. Under The Revenue Act of 1942 (the "1942 Act") Congress renamed the Board to "The Tax Court of the United States," and declared that the Board Members be known as "judges" and the "Chairman" of the Board be known as the "Presiding Judge."[3]

63. History suggests that the 1942 Act's renaming provisions were motivated in large part by efforts to remedy perception and vanity, e.g., to reduce confusion among the public regarding the informal nature of the Board because of its agency status within the Executive Branch, to encourage the judiciary to permit greater use of hearing rooms without being subject to criticism for favoritism of one administrative body over another, and to alleviate the Board Members' embarrassment when they were referred to as "judges" without being granted that title.

---

[2] The current removal statute states: "[j]udges of the Tax Court may be removed by the President, after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause." 26 U.S.C. § 7443.

[3] In 1948, the "Presiding Judge" was again renamed to the "Chief Judge."

64. Notwithstanding the 1942 Act's renaming, Congress otherwise left intact the provisions regarding the jurisdiction, powers, and duties of the former Board, and the statute provided it would remain "an independent agency in the Executive Branch of Government." *Freytag*, 501 U.S. at 912 (Scalia, J., concurring in part and concurring in the judgment) ("Though renamed 'the Tax Court of the United States' in 1942, it remained 'an independent agency in the Executive Branch,' 26 U.S.C. § 1100 (1952 ed.), and continued to perform the same function.").

65. The Supreme Court "continued to treat it as an administrative agency, akin to the Federal Communications Commission (FCC) or the National Labor Relations Board (NLRB)." *Id.* (citing *Dobson v. Commissioner*, 320 U.S. 489, 495–501 (1943)).

66. Congress unequivocally established the Board under the Executive Branch of the Government—first as an independent executive agency in 1924, and still later under its 1942 renamed designation that remained in the Executive Branch.

67. During the late 1940s, various proposals aimed to strip the former Board of its Executive Branch status and shift its governing provisions from the Internal Revenue Code of Title 26 ("Title 26") to Title 28, which governs the federal judicial system, but those initiatives failed to gain momentum.

68. In the late 1960s, efforts were renewed to fold the former Board into the federal judiciary and grant it Article III status, but the initiative was ultimately abandoned because it lacked support, including from the Department of Justice, the Treasury Department, and the United States Judicial Conference.

69. Rejecting efforts to transform the former Board into the federal judiciary and grant it Article III status, under the Tax Reform Act of 1969 (the "1969 Act"), Congress ultimately amended the status provision to provide: "There is hereby established, under article I of the

Constitution of the United States, a court of record to be known as the United States Tax Court" ("Tax Court"), and the term of Tax Court judges was extended from twelve years to fifteen years.

70. The 1969 Act did not alter the presidential removal provision and left the Tax Court's governing provisions in Title 26 rather than moving them to Title 28.

71. For the forty-five years preceding Congress's 1969 relabeling of the former Board as the Tax Court and identifying it as an Article I "court of record," the Tax Court was expressly designated by Congress as an agency within the Executive Branch. *See* Brief for Respondent at 9, *Freytag*, 501 U.S. 868.

72. The 1969 amendment to 26 U.S.C. § 7441 ("§ 7441") did not remove the Tax Court from the Executive Branch or transfer the Tax Court to another branch. *See id*. ("Although Congress established the Tax Court as a 'court of record' under 'article I of the Constitution' in 1969, its function, and the manner in which it performs that function, did not change. Nothing in the terms of the 1969 legislation purported to remove the Tax Court from the Executive Branch or to incorporate it into either the Legislative or Judicial Branches. It therefore remains an Executive Branch agency.").

73. An uncodified provision of the 1969 Act clarified the same:

> The United States Tax Court established under the amendment made by section 951 [of Pub. L. No. 91-172] is a continuation of the Tax Court of the United States as it existed prior to the date of the enactment of this Act, the judges of the Tax Court of the United States immediately prior to the date of enactment of this Act shall become the judges of the United States Tax Court upon the enactment of this Act, and no loss of rights or powers, interruption of jurisdiction, or prejudice to matters pending in the Tax Court of the United States before the date of enactment of this Act shall result from the enactment of this Act.

Tax Reform Act of 1969, Pub. L. No. 91-172, § 961, 83 Stat. 487, 735-36.

74. The future Chief Justice Roberts, as then Deputy Solicitor General for the Department of Justice, described the effect of the 1969 Act best at oral argument in *Freytag*:

> Now, petitioners as we understand it do not dispute that the tax court was in the executive branch prior to 1969. The question becomes, what happened in 1969 that made it any different? Congress took language that said this is an agency in the executive branch and substituted language saying this is a court of record under article I. We agree with the Second Circuits recent decision that what they did was change the label. They didn't purport in the statute to move the tax court outside the executive branch and didn't purport to put it in any other branch.
>
> The legislative history did say -- not the statute, the legislative history -- we think that the tax court should be considered an article I court rather than an executive agency. ***To our way of looking at it, that's like saying something should be considered an orange rather than a fruit.*** It's both. There - - the article I court - - quite happy to call it that - - but it remains in the executive branch.
>
> And we think that's confirmed by the fact that in 1969, Congress continued the incumbent tax court judges in office. If Congress were doing something as dramatic as moving the tax court out of the executive branch and placing it somewhere else, it plainly would have no authority to continue those judges in office. That would be an appointment from one entity to another. But it did not do that. It continued them, and quite properly so because it was not moving it from one branch to another.

*Freytag*, 501 U.S. 868 (Tr. of Oral Arg. at 50:13-51:15), No. 90-762 (emphasis added).

75. It is clear that "[w]hen the Tax Court was statutorily denominated an 'Article I Court' in 1969, its judges did not magically acquire the judicial power." *Freytag*, 501 U.S. at 912 (Scalia, J., concurring in part and concurring in the judgment).

76. Unlike Article III judges, Tax Court judges do not hold life tenure and their salaries may be reduced. *Id*. Moreover, and most importantly, Tax Court judges *now* may be removed by the President at will. *See Slaughter*, 146 S. Ct. at 2293 (holding that officers exercising executive power must be removable at will by the President).[4]

---

[4] In *Slaughter*, Justice Sotomayor, with whom Justices Kagan and Jackson joined, dissenting, opined on the Tax Court's function: "The majority, for example, suggests that its rule might not apply to adjudicatory agencies, including non-Article III courts like the Tax Court. See *ante*, at 2306. That is welcome news, but why is it so? As the majority explains, it cannot be because such agencies are exercising judicial power. Adjudications by Executive Branch agencies 'are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Slaughter*, 146 S. Ct. at 2344 (Sotomayor, J., dissenting) (quoting *Arlington v. FCC*, 569 U.S. 290, 305, n. 4 (2013); *see ante*, at 2300 – 2301).

77. As reasoned by Justice Scalia:

> How anyone with these characteristics can exercise *judicial* power "independent ... [of] the Executive Branch" is a complete mystery. It seems to me entirely obvious that the Tax Court, like the Internal Revenue Service, the FCC, and the NLRB, exercises executive power.

*Freytag*, 501 U.S. at 912 (Scalia, J., concurring in part and concurring in the judgment) (emphasis in original) (citations omitted).

78. The Tax Court's constitutional status has remained unchanged throughout its history, notwithstanding changes to the Tax Court's name and the titles of its judges.

79. From its inception to the present, the Tax Court has been situated within the Executive Branch under the U.S. Constitution's tripartite structure and therein it remains.

*B. <u>Freytag v. Comm'r</u>*

80. In *Freytag*, the Supreme Court was presented with a narrow Appointments Clause question: whether the Chief Judge of the Tax Court could constitutionally appoint special trial judges to hear and decide complex tax cases. *See Freytag*, 501 U.S. at 870.

81. The Supreme Court, in a 5-4 majority opinion by Justice Blackmun, held that the appointment was valid because the Tax Court qualifies as a "Court of Law" within the meaning of Article II, Section 2, Clause 2 of the U.S. Constitution. *See id*. at 892.

82. The Supreme Court rejected the argument advanced by the future Chief Justice Roberts, as then Deputy Solicitor General for the Department of Justice, that the chief judge of the Tax Court possessed the power to appoint the special trial judge as the Head of a Department in the Executive Branch. *See id*. at 884-85.

83. Critically, the majority simply held that the Tax Court was not a "Department," and its "Court of Law" classification of the Tax Court was limited to the Appointments Clause context. *See id*. at 888, 892.

84. *Freytag* did not resolve—and explicitly declined to resolve—the broader structural question of which branch of the tripartite government the Tax Court belongs to.

85. Justice Scalia's concurrence in *Freytag*—joined by Justices O'Connor, Kennedy, and Souter, concurring in part and concurring in the judgment—offers a more illuminating analysis of the U.S. Constitution's tripartite structure issue. As Justice Scalia prophetically observed, the *Freytag* majority's reasoning was "full of danger for the future of our system of separate and coequal powers." *Id*. at 901 (Scalia, J., concurring in part and concurring in the judgment).

86. The future Chief Justice Roberts explained at oral argument in *Freytag* that the Tax Court must exist within one of the three branches of our tripartite structure of government, and the only branch within which it makes sense for the Tax Court to exist is the Executive Branch:

> Now, if the tax court is going to exist as a constitutional entity, it must be in the executive branch, because there are only three branches. Petitioners are correct. That is our view. And we know that it is not in the legislative branch, and it is not an article III court.

*Freytag*, 501 U.S. 868 (Tr. of Oral Arg. at 49:5-10), No. 90-762.

87. In the briefing in *Freytag*, Chief Justice Roberts observed, "As an initial matter, the Tax Court must be located within one of the three Branches of the federal government. The tripartite structure of the U.S. Constitution, and this Court's faithful adherence to that organization, admit of no other alternative." Brief for Respondent at 33, *Freytag*, 501 U.S. 868 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *Buckley v. Valeo*, 424 U.S. 1, 120 (1976)).

88. Chief Justice Roberts argued that the Tax Court cannot be in the Legislative Branch because it exercises no legislative power:

> It is clear that the Tax Court cannot be in the Legislative Branch. Although Congress theoretically could perform some of the Tax Court's functions by enacting private bills in response to the petitions of individual taxpayers, it could do so only by passing laws in conformity with the Bicameralism and Presentment

> Clauses. That work could not be performed by the Tax Court because legislative power is not delegable: Senators and Representatives could not delegate the power to enact private bills any more than they could "send delegates to consider and vote on bills in their place." The notion that the Tax Court may be "an independent judicial body in the legislative branch" must be rejected at the outset as wholly contrary to our system of separated powers. In fact, the Tax Court does not pass private bills or exercise any other legislative power. Instead, it decides tax controversies between the Commissioner and taxpayers.

*Id*. at 33-34 (citations omitted).

89. Moreover, Chief Justice Roberts argued that the Tax Court cannot be considered part of the Article III Judicial Branch because its judges lack life tenure and protection against salary reduction. *See id*. at 35 ("Although Congress established the Tax Court as 'a court of record,' Section 951 of the Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 730, more than that appellation and the function of applying law to fact in particular cases is needed for Article III status.").

90. Put another way, "[s]uch tribunals, like any other administrative board, exercise the executive power, not the judicial power of the United States. They are, in the words of the great Chief Justice, 'incapable of receiving [the judicial power]'—unless their members serve for life during good behavior and receive permanent salary." *Freytag*, 501 U.S. at 909 (Scalia, J., concurring in part and concurring in the judgment) (quoting *American Ins. Co. v. Canter,* 1 Pet. 511, 546, 7 L.Ed. 242 (1828) (Marshall, C.J.)).

91. As articulated by Justice Scalia, the historical origins of Article III courts provide meaning to the purpose of the tripartite structure as constructed by the Framers:

> Like the President, the Judicial Branch was separated from Congress not merely by a paper assignment of functions, but by endowment with the means to resist encroachment—foremost among which, of course, are life tenure (during "good behavior") and permanent salary. These structural accoutrements not only assure the fearless adjudication of cases and controversies; they also render the Judiciary a potential repository of appointment power free of congressional (as well as Presidential) influence. In the same way that depositing appointment power in a

> fortified President and his lieutenants ensures an *actual* exclusion of the legislature from appointment, so too does reposing such power in an Article III court. The Court's holding, that Congress may deposit such power in "legislative courts," without regard to whether their personnel are either Article III judges *or* "Heads of Departments," utterly destroys this carefully constructed scheme.

*Freytag*, 501 U.S. at 907-908 (Scalia, J., concurring in part and concurring in the judgment) (cleaned up) (emphasis in original) (citations omitted).

92. As outlined *supra*, the Tax Court has always resided in the Executive Branch, despite its many changes in nomenclature. "Given the history of the Tax Court, this conclusion should come as no surprise." Brief for Respondent at 37, *Freytag*, 501 U.S. 868.

93. The Tax Court "reviews determinations by Executive Branch officials (the Internal Revenue Service) that this much or that much tax is owed—a classic executive function. For 18 years its predecessor, the Board of Tax Appeals, did the very same thing . . . ." *Freytag*, 501 U.S. at 911 (Scalia, J., concurring in part and concurring in the judgment) (citation modified).

94. The Tax Court resides in the Executive Branch despite any adjudicative function it may possess. *See id.* at 909 ("It is no doubt true that all such bodies 'adjudicate;' *i.e.*, they determine facts, apply a rule of law to those facts, and thus arrive at a decision. But there is nothing 'inherently judicial' about 'adjudication.' To be a federal officer and to adjudicate are necessary but not sufficient conditions for the exercise of federal judicial power, as [the Supreme Court] recognized almost a century and a half ago.") (citation modified).

95. The Tax Court's history, the absence of Article III protections, and the nature of its functions confirm that it is (and always has been) situated within the Executive Branch.

96. *Freytag* neither decided nor purported to decide the overarching structural issue of where the Tax Court fits within the federal government's tripartite framework, expressly leaving that question open.

97. Oral argument in *Freytag* suggests that the majority may have been concerned about the implications that a determination that the chief judge had not been properly appointed may have had on the legitimacy of actions taken in the Tax Court's name and the challenges that might have resulted from such a determination.

98. But the Supreme Court should not excuse unconstitutional action on the grounds that enforcing the U.S. Constitution would be disruptive; the breadth of the consequences is the very reason to remedy the violation, not to disregard it.

*C. Post-Freytag Landscape*

99. More than twenty years after *Freytag*, the United States Court of Appeals for the District of Columbia had an opportunity to analyze to which tripartite branch the Tax Court belongs in a challenge brought by taxpayers regarding the presidential removal of Tax Court judges in *Kuretski v. Comm'r*, 755 F.3d 929, 938 (D.C. Cir. 2014).

100. The taxpayers argued that the presidential removal of Tax Court judges violated the constitutional separation of powers because the Tax Court exercises judicial power under Article III, or, in the alternative, that it is part of the Legislative Branch; therefore, potential "interbranch removal" by the President was unconstitutional. *Id*. at 938.

101. *Kuretski* did not reach the circumstances in which interbranch removal may present a separation of powers concern because it found that the Tax Court exercises authority as part of the Executive Branch; thus, Presidential removal of a Tax Court judge "would constitute an intra—not inter—branch removal" that is consistent with separation of powers principles. *Id*. at 932, 939.

102. The *Kuretski* court rejected the argument advanced by the taxpayers that the 1969 Act transformed the Tax Court into a part of the Article III Judicial Branch:

> There is no indication, however, that by prescribing that the Tax Court had been established under Article *I,* Congress somehow converted what had been an Executive Branch tribunal into an Article *III* court. The legislative history in fact indicates a belief and intention that the Tax Court is not an Article III body. *See* S.Rep. No. 91–552, at 304 n. 2 (1969) ("limitations of Article III of the Constitution, relating to life tenure and maintenance of compensation," do not apply to Tax Court judges). It would seem clear, then, that the Tax Court is not a part of the Article III Judicial Branch, and that its judges do not exercise the "judicial Power of the United States" under Article III.

*Id*. at 940 (emphasis in original).

103. Stated another way, "Congress did not, however, move the Tax Court outside the Executive Branch altogether." *Id*. at 944.

104. Rejecting the taxpayers' reliance on *Freytag*'s majority, *Kuretski* reasoned that *Freytag* did not call into question the constitutionality of the President's removal power over Tax Court judges under 26 U.S.C. § 7443(f) because *Freytag* itself treated territorial courts as "Courts of Law" even though territorial judges were understood to be removable by the President and because *Freytag*'s reference to the Tax Court exercising "judicial power" was in a non–Article III sense:

> The [*Freytag*] Court therefore used the phrase "judicial power" in "an enlarged sense," not in the particular sense employed by Article III. *See Murray's Lessee,* 59 U.S. at 280 ("judicial act" in "an enlarged sense" encompasses "all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law"); *cf. City of Arlington v. FCC,* —— U.S. ——, 133 S.Ct. 1863, 1877–78, —— L.Ed.2d —— (2013) (Roberts, C.J., dissenting) (administrative agencies exercise "judicial power" when they "adjudicat[e] enforcement actions and impos[e] sanctions on those found to have violated their rules"). As another court of appeals has explained, a "central lesson from *Freytag* is that adjudication by adversarial proceedings can exist outside the context of Article III." *S.C. State Ports Auth. v. Fed. Mar. Comm'n,* 243 F.3d 165, 171 (4th Cir.2001), *aff'd,* 535 U.S. 743, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002); *see Freytag,* 501 U.S. at 891, 111 S.Ct. 2631 (Tax Court is "an adjudicative body"). The *Freytag* Court, after all, repeatedly compared the Tax Court to the non-Article III territorial courts. *See id.* at 889–90, 892, 111 S.Ct. 2631.

*Id.* at 942.

105. *Kuretski* likewise rejected the taxpayers' argument that the Tax Court belongs to the Legislative Branch, reasoning that reference to the Tax Court as an "Article I legislative court" simply describes the source of its authority—i.e., that it is created under Congress's non–Article III powers—not that it wields legislative power or is part of Congress.

106. *Kuretski* duly recognized as follows:

> The Tax Court's status as an "Article I legislative court," *Freytag,* 501 U.S. at 888, 111 S.Ct. 2631, does not mean that its judges exercise "legislative power" under Article I. *Cf. Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472–73, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("legislative power" consists of decisionmaking authority without any "'intelligible principle to which the person or body authorized ... is directed to conform'" (quoting *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928))). The Tax Court is in the business of interpreting and applying the internal revenue laws, *see Freytag,* 501 U.S. at 891, 111 S.Ct. 2631, not in the business of making those laws. And the Tax Court's Article I origins do not distinguish it from the mine run of Executive Branch agencies whose officers may be removed by the President. After all, every Executive Branch entity, from the Postal Service to the Patent Office, is established pursuant to Article I. *See* U.S. Const. art. I, § 8, cl. 7 (Postal Clause); *id.* art. I, § 8, cl. 8 (Copyright and Patent Clause). The Tax Court no more exercises Article I powers than do those agencies. The Tax Court's status as an "article I legislative court" therefore presents no barrier to presidential removal of Tax Court judges. *See Mistretta,* 488 U.S. at 411 n. 35, 109 S.Ct. 647 ("the President may remove a judge who serves on an Article I court").

*Id.* at 943.

107. Ultimately, in keeping with *Freytag*, *Kuretski* confirmed that the Tax Court exercises its authority as part of the Executive Branch. *See id.* ("We have explained that Tax Court judges do not exercise the 'judicial power of the United States' pursuant to Article III. We have also explained that Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch. It follows that the Tax Court exercises its authority as part of the Executive Branch."). Consequently, *Kuretski* found Presidential removal of Tax Court judges consistent with the separation of powers principles.

108. Following *Kuretski*, in 2015, Congress amended § 7441 to add, "The Tax Court is not an agency of, and shall be independent of, the executive branch of the Government." 26 U.S.C. § 7441.

109. The reason for this change was articulated in the Senate Finance Report as follows: "The Committee is concerned that statements in *Kuretski v. Commissioner* may lead the public to question the independence of the Tax Court, especially in relation to the Department of Treasury or the Internal Revenue Service. The Committee wishes to remove any uncertainty caused by *Kuretski v. Commissioner*, and to ensure that there is no appearance of institutional bias." S. Rept. No. 114-14. The explanation of the provision states, "[t]he provision clarifies that the Tax Court is not an agency of, and shall be independent of, the Executive Branch." *Id*.

110. Congress's 2015 amendment was a direct legislative response to *Kuretski*, but an ineffective one—like all of Congress' other attempts to cure the Tax Court's lack of impartiality. *See* S. Rept. No. 91-552. ("However, its constitutional status as an executive agency, no matter how independent, raises questions in the minds of some as to whether it is appropriate for one executive agency to be sitting in judgment on the determinations of another executive agency.").

111. Congress's 2015 decision to amend § 7441 in response to the appearance of institutional bias is, at most, evidence that Congress itself recognized an appearance of institutional bias; it does not establish that any institutional bias was actually cured, and the amendment's limited, largely declaratory nature confirms that the attempted fix was ineffective to eliminate the underlying concern.

112. After all, Congress's 2015 amendment did not expressly state that the Tax Court is *removed* from the Executive Branch, nor did it transfer the Tax Court to another branch. Further, the 2015 amendment did not change the presidential removal provision for Tax Court judges, left

the Tax Court's governing provisions in Title 26 rather than moving them to Title 28, and it did not extend to Tax Court judges the protections afforded to the Article III judges.

113. In short, Congress has long since recognized the impartiality problem, but Congress's changes to the statutory language have failed to fix it.

114. Even after Congress's 2015 amendment, in *Crim v. Commissioner of Internal Revenue*, 66 F.4th 999, 1001 (D.C. Cir. 2023), the D.C. Circuit endorsed *Kuretski*'s separation of powers analysis (and its use of *Freytag*) and rejected the notion that Congress's post-*Kuretski* amendment to § 7441 resolves the constitutional question.

115. *Crim* emphasized that such statutory labeling is not controlling, observing:

> Of course, the Supreme Court has cautioned that "congressional pronouncements are not dispositive" of the status of a "governmental entity for purposes of separation of powers analysis under the Constitution." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 51, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015). Here Congress sought only to "ensure that there is no appearance of institutional bias" when the Tax Court adjudicates disputes between the IRS and taxpayers. S. Rep. No. 114-14, at 10. Crim has not demonstrated that congressional action has undermined the separation of powers analysis adopted in *Kuretski*.

*Id.* at 1001.

116. The *Crim* dissent expressed a persuasive similar sentiment, likewise rejecting the taxpayer's argument that the recent change to the Tax Court's authorizing statute meant that it is no longer part of the Executive Branch:

> If the Tax Court *were* outside of the executive branch, the President's power to remove its judges would be problematic. But because the Tax Court is inside the executive branch, there is no such problem. True, in 2015 Congress amended the Tax Court's authorizing statute to say the "Tax Court is not an agency of, and shall be independent of, the executive branch of the Government." 26 U.S.C. § 7441. But that amendment did not change the Tax Court's position within our system of government. So the Tax Court remains part of the executive branch, just as it was before the amendment. *See Kuretski v. Commissioner*, 755 F.3d 929, 939 (D.C. Cir. 2014) ("the Tax Court exercises its authority as part of the Executive Branch").
>
> . . .

> Here, Congress's amendment did not meaningfully change the Tax Court's structural features. As before, the President can remove tax judges. 26 U.S.C. § 7443(f). That power gives the President some control over the Tax Court, suggesting that it is part of the executive branch. *See Bowsher v. Synar*, 478 U.S. 714, 727-732, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (Congress's power to remove the Comptroller General meant that he was part of the legislative branch).
>
> Plus, Congress's amendment does not change the Tax Court's powers. Those powers are, and have always been, executive. *See Direct Marketing Association v. Brohl*, 575 U.S. 1, 9, 135 S.Ct. 1124, 191 L.Ed.2d 97 (2015). Since at least 1798, Congress has vested the power to assess and collect taxes in the executive branch. *See, e.g.*, Act of July 9, 1798, ch. 70, §§ 8, 20 1 Stat. 580, 585, 588 (authorizing executive-branch "commissioners" to assess taxable property and providing an administrative appeals process for contesting "inequality or error" in those assessments).
>
> Rather than changing the Tax Court's structure, Congress's statement that the court is "independent of[ ] the executive branch" merely confirms that tax judges have statutorily fixed terms and for-cause removal protection. *See* 26 U.S.C. §§ 7441, 7443(e)-(f). Of course, tax judges cannot be truly and fully "independent" because "lesser officers must remain accountable to the President, whose authority they wield." *Seila Law LLC v. CFPB*, —— U.S. ——, 140 S. Ct. 2183, 2197, 207 L.Ed.2d 494 (2020).

*Id*. at 1007 (Circuit Judge Walker, dissenting).

117. Congress's revisions to the Tax Court's statutory nomenclature—and its efforts to address any perceived appearance of institutional bias—do not alter the constitutional reality: the Tax Court has remained situated within the Executive Branch, and Tax Court judges remain subject to presidential supervision and removal—a point the Supreme Court's recent separation of powers decisions have underscored with increasing clarity and have now made absolute. *See Slaughter*, 146 S. Ct. 2283.

D. *The Structure of the Tax Court, By its Nature, Violates Taxpayers' Procedural Due Process Rights, Including Plaintiffs' Procedural Due Process Rights*

118. The Due Process Clause of the U.S. Constitution "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

119. "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." *Id.*

120. "At the same time, it preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done, by ensuring that no person will be deprived of his interests in the absence of a proceeding in which *he may present his case with assurance that the arbiter is not predisposed to find against him*." *Id.* (internal citations and quotations omitted) (emphasis added).

121. The Supreme Court has consistently held that this principle "applies to administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

122. "Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the *probability* of unfairness." *Id.*, 421 U.S. at 47 (internal citations and quotations omitted) (emphasis added).

123. In determining whether an adjudicator is considered neutral, courts do not ask "whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional *potential for bias*." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 881 (2009) (emphasis added).

124. This is because "justice must satisfy the *appearance* of justice." *In re Murchison*, 349 U.S. 133, 136 (1955) (citation and internal quotations omitted) (emphasis added).

125. Accordingly, the Due Process Clause "may sometimes bar trial by judges who have no actual bias." *Id.*

126. Moreover, "no man can be a judge in his own case." *Id.*

127. In *Ward v. Vill. of Monroeville, Ohio*, the Supreme Court held the due process clause was violated where a mayor who received no direct fees but whose court fines went to the village treasury, because "the mayor's executive responsibilities for village finances" created a "*possible temptation*" to maintain high conviction rates. 409 U.S. 57, 60 (1972) (emphasis added).

128. Similarly, the Tax Court adjudicates claims against taxpayers that, if the IRS wins, allows the Government to raise more revenue.

129. Under those circumstances, Tax Court judges have an institutionalized *possible temptation* to find for the IRS and against taxpayers so that the Government may raise additional tax revenue.

130. Moreover, as discussed previously, the IRS and the Tax Court are both part of the Executive Branch.

131. Under the logic of *Slaughter*, Tax Court judges are, or should be, removable at will by the President.

132. Accordingly, to keep their jobs, Tax Court judges must appease the President, who is part of the Executive Branch.

133. Tax Court judges appease the President by enforcing the tax laws and raising revenue for the Government.

134. The Tax Court is therefore structurally biased in favor of the IRS and against taxpayers.

135. Many taxpayers, unfortunately, have had that experience firsthand.

136. Plaintiffs are taxpayers litigating their dispute against the IRS in front of the Tax Court.

137. The Tax Court is not a neutral adjudicator as between Plaintiffs and the IRS.

138. This is the natural result of Tax Court cases being adjudicated by members of the Executive Branch—Tax Court judges—between one party, the IRS, *which is part of the executive branch*, against the other party, a private taxpayer.

139. Plaintiffs' Procedural Due Process rights are being violated because they are litigating against the Government in the Tax Court.

140. Plaintiffs here seek only a fair and neutral adjudication of their alleged tax liabilities in a fair and neutral tribunal before a fair and neutral adjudicator.

*E. Plaintiffs Reasonably Fear Their Tax Court Case Is a Mere Continuation of the IRS's Unfair Investigation into Plaintiffs by the Same Executive Branch*

141. Not only is the Tax Court structurally biased against taxpayers, including Plaintiffs, but Plaintiffs have also experienced that the Government, i.e., *the Executive Branch*, has been treating them unfairly and abusing their rights throughout this process.

142. This raises reasonable and justified doubts in Plaintiffs, even beyond the structural bias of the Tax Court discussed above, that Plaintiffs will somehow obtain a fair trial in Tax Court, *which is also part of the Executive Branch*.

143. The Government's unfair treatment of Plaintiffs began during the IRS's investigation into Feingold, FMS and FLLC.

144. In or about 2021, the West Palm Beach office of the IRS commenced an audit of Feingold, FMS and FLLC's tax returns and businesses, focusing initially on tax years 2018 and 2019.

145. The initial examination encompassed approximately two dozen document and information requests. Feingold, FMS and FLLC ensured that all requests were responded to in full and prior to any deadline. At no point did the IRS claim that there was any stalling, insufficient provision of information, or that full and complete answers were not provided.

146. Feingold, FMS and FLLC's responses were handled by then tax counsel, Lauren Matta, an experienced tax practitioner.

147. Part of the tax returns included multi-million-dollar transactions in complex derivatives known as forward purchase agreements ("FPAs"), which are unique and complex instruments often employed in the financial securities industry.

148. Feingold, FMS and FLLC carefully followed the tax guidance regarding the FPAs' proper treatment. Feingold, FMS and FLLC employed the tax treatment techniques with respect to FPAs that had been used by well-known persons in finance, including those who had previously challenged the IRS on the tax treatment of FPAs and prevailed.

149. After expending significant resources and time, Feingold, FMS and FLLC settled the FPA tax case with the *IRS* by paying approximately $900,000 in taxes. That settlement was in no way an admission of wrongdoing by Feingold, FMS and FLLC. It instead was a result of the costs of litigation and trial exceeding the proposed settlement. The *Tax Court* issued a full order closing this issue with no finding of wrongdoing or intentional fraud against Feingold, FMS and FLLC, and Feingold, FMS and FLLC fully satisfied this settlement obligation.

150. Despite this, the Government seeks to reassert tax against Feingold, FMS and FLLC on the FPA matters that were already settled, which would result in a triple tax on Feingold, FMS and FLLC (the tax was already paid and the tax case then settled for $900,000).

151. The Government is pursuing this aggressive action against Feingold, FMS and FLLC because it knows it can. Specifically, it argues that Feingold, FMS and FLLC's only recourse is in Tax Court—where the prosecution (IRS) is on the same team as the Tax Court.

152. The Government is doing this both to obtain retribution against Feingold, FMS and FLLC for daring to challenge their tax liability and also to simply raise more tax revenue for the Government, however unfairly.

153. The Government knows that as long as the case against Plaintiffs is in Tax Court, the Government will probably win.

154. And Plaintiffs—just like other taxpayers in Plaintiffs' position—know that too, particularly in light of the clear implications following the Supreme Court's decision in *Trump v. Slaughter*.

155. But Plaintiffs' Tax Court Case violates the Due Process Clause of the U.S. Constitution.

156. And, as will be explained below, based on the Government's unfavorable and retaliatory treatment of Feingold, FMS and FLLC during the IRS investigation, Plaintiffs reasonably fear that the Tax Court Case may be as unfair against them as the IRS investigation that preceded it.

157. Following the Government's improper reassertion of tax against Feingold, FMS and FLLC, Jennifer Miller ("Miller") was the initial agent who interviewed Feingold, FMS and FLLC. During that interview, she conveyed her personal lack of belief that the techniques involving FPAs were lawful, and she also challenged business expenses that Feingold, FMS and FLLC had properly recognized.

158. Miller abused her power in an egregious manner in many ways and for reasons unrelated to the collection of tax against Feingold, FMS and FLLC.

159. As a result of Miller's and the IRS's misconduct, Feingold, FMS and FLLC retained David D. Aughtry ("Aughtry") to represent them. On May 14, 2021, Aughtry contacted the Commissioner of the IRS at the time, Charles Rettig ("Rettig"), and informed him of the repeated violations of Plaintiffs' rights by Miller and the IRS. (*See* Aughtry Letter attached hereto as **Exhibit 2**).

160. Miller appears to have been removed or to have recused herself from the investigation after Aughtry sent the letter, but the IRS kept the same supervisor in charge of Plaintiffs' file.

161. Miller's replacement was Chatelain. Chatelain also worked out of the West Palm Beach Office of the IRS and shared the same supervisor as Miller.

162. Chatelain and the IRS proceeded, however, with a course of abusive conduct against Feingold, FMS and FLLC.

163. This repeated conduct showed that the IRS personnel involved did not hesitate to act in an unlawful manner towards Feingold, FMS and FLLC.

164. The IRS proceeded to open audits against Feingold, FMS and FLLC for additional tax years.

165. These multiple audits were opened despite the fact that Feingold, FMS and FLLC had hired Jay Shapiro, a licensed CPA who is well known for his prior work involving the IRS (as well as his father's prior employment with the IRS), to oversee all of Feingold, FMS and FLLC's accounting and tax work.

166. The IRS also referred Feingold, FMS and FLLC's tax file to the Department of Justice ("DOJ") for criminal prosecution. The DOJ reviewed Feingold, FMS and FLLC's file and did not accept the criminal referral, acknowledging that the allegations did not support criminal prosecution. Nonetheless, the referral was telling. The IRS was less concerned about what tax should actually be assessed. Its focus was instead retaliation and the assertion of unchecked power.

167. The IRS also undertook an aggressive and unwarranted bank reconciliation audit of Feingold, FMS and FLLC's accounts despite Feingold, FMS and FLLC having provided them with the records and books maintained by Shapiro. This caused Feingold, FMS and FLLC extensive expense and difficulty in handling such a detailed audit.

168. Chatelain was so illogical and harassing in her conduct that at one point she challenged whether Feingold, FMS and FLLC owned an aircraft and called demanding to go to the corporate office to inspect the aircraft. Besides the obvious fact that an aircraft is not parked at an office building, the IRS already had all paperwork proving aircraft ownership, and a simple review of FAA records could have easily confirmed the same. This request was made only to harass Feingold, FMS and FLLC and for the IRS to arbitrarily wield its power against Feingold, FMS and FLLC.

169. In the interim, Feingold, FMS and FLLC filed for a refund given that they actually overstated their income by hundreds of thousands of dollars in their tax returns. Despite this, no refund has been provided, seeming to indicate that monies are being withheld as leverage and in further retaliation towards Feingold, FMS and FLLC. With accrued interest, this refund now totals over $1.1 million.

*F. The Unconstitutional Notices*

170. Feingold, FMS and FLLC ultimately received the Unconstitutional Notices from the IRS dated September 12, 2024 and attached hereto as **Exhibit 3**.

171. Chatelain asserted a civil fraud penalty against FMS and FLLC. Chatelain also made an initial proposal that the civil fraud penalty apply to Feingold. Chatelain's supervisor, however, did not approve the application of the civil fraud penalty against Feingold as required.

172. The Unconstitutional Notice as to Feingold for tax years 2020 and 2021 nevertheless includes a civil fraud penalty form.

173. The Unconstitutional Notices were issued without obtaining the necessary written supervisor signature and without the approval of a fraud examination advisor, both of which are required.

174. Tellingly, the Government also disallowed certain business expenses that they had previously allowed in previous years.

175. In sum, the IRS and Chatelain continued to arbitrarily abuse its power against Feingold, FMS and FLLC.

176. To combat circumstances such as this, 26 U.S.C. §6751(b)(1) additionally requires that in order to proceed with a fraud claim, *disinterested* IRS personnel must sign off and approve the claim.[5] Indeed, Congress intended to limit the IRS to asserting penalties only in situations in which the penalty is "appropriate" and "not as a bargaining chip." S. Rept. 105-174, at 65 (1998), 1998-3 C.B. 537, 601.

177. Unsurprisingly, this requirement was not followed in Plaintiffs' case.

[5] This, of course, assumes that *any* IRS personnel are truly "disinterested" in practice.

178. When it was discovered that the IRS and Chatelain consciously ignored this requirement, the IRS just asked Plaintiffs to waive that requirement. Plaintiffs refused.

179. The statutory purpose—preventing the threat of penalties as a "bargaining chip," as explained in S. Rept. 105-174, at 65 (1998)—is particularly salient given the IRS and Chatelain's continued abuses of power and retaliation campaign present here. Congress enacted this supervisory approval requirement to provide a procedural safeguard preventing the retaliatory threat of penalties or leverage for negotiating case resolution. The Government's failure to involve a fraud enforcement advisor and to obtain disinterested, compliant signatures illustrates its disregard for Plaintiffs' rights and is compounded by the context of Plaintiffs' prior complaint to Rettig.

180. Despite this, on September 12, 2024, the Government sent Feingold, FMS and FLLC the Unconstitutional Notices, which, if the taxpayer disagrees with the Government, provide only that:

**If you disagree with the Notice of Deficiency**
If you want to contest our final determination, you have 90 days from the date of this letter (150 days if addressed to you outside of the United States) to file a petition with the United States Tax Court.

181. Accordingly, from the face of the Unconstitutional Notices, the only forum the Government provided to "contest our final determination" *is in Tax Court.*

182. On that basis, Feingold, FMS and FLLC, out of an abundance of caution, exercised the only option afforded to them by the Unconstitutional Notices, despite that this option was and is unconstitutional— Feingold, FMS and FLLC filed the Tax Court Case in the Tax Court.

183. This Tax Court Case is merely an extension of the Executive Branch's—through the IRS's—abusive, unconstitutional, harassing, and retaliatory campaign against Feingold, FMS and FLLC.

184. In other words, following the IRS's investigation of Feingold, FMS and FLLC, the Government has proceeded to aggressively litigate the Tax Court Case and has sought to further harm Plaintiffs.

185. The Government has been emboldened to aggressively litigate the Tax Court Case because it knows that, by its very structure, Tax Court judges are on their side and are opposed to Plaintiffs.

186. That is, the IRS (the prosecutor) is part of the Executive Branch, and the Tax Court itself (the adjudicator) is also part of the Executive Branch.

187. In sum, for the reasons discussed above, the Tax Court is structurally biased, and Plaintiffs' Tax Court Case in the Tax Court is therefore unconstitutional on its face.

188. Furthermore, it is unquestionable that given the Government's unfair treatment of Plaintiffs specifically *in the IRS investigation and now in the Tax Court Case*, it is even more apparent that Plaintiffs are unlikely to obtain a fair trial in the Tax Court under these circumstances.

189. The Constitution, however, does not allow for even a *probability of unfairness* or a *potential for bias*.

190. On its face and as applied to the Tax Court Case against Plaintiffs, the Tax Court Case is unconstitutional.

191. The Tax Court Case that Feingold, FMS and FLLC were forced to initiate would have never been initiated if the Unconstitutional Notices were constitutional and afforded them the impartial and disinterested tribunal they are entitled to litigate in under the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

192. Plaintiffs now seek to vindicate their constitutional rights under *Slaughter*'s logic and to ensure that they are able to litigate their dispute against the IRS in a fair tribunal and in front of a neutral adjudicator as is their right under the Constitution.

**II. Xi and Chatelain**

193. Xi and Chatelain have grossly abused their power and positions and deprived Feingold, his companies, his family, their businesses, and his clients of their protected rights.

194. Xi and Chatelain have worked in *ultra vires* and constitutionally void concert to impose a number of sanctions against Plaintiffs, including the unconstitutional imposition of penalties against Plaintiffs. (*See, e.g.*, the Unconstitutional Notices, which again on their face seek to penalize Plaintiffs in direct violation of the Fifth and Seventh Amendments, and the Unconstitutional Summons).

195. Feingold is not some random target; he draws the ire of Chatelain and Xi and they are seeking to destroy his life. Their conduct is outrageous.

196. Chatelain's *ultra vires*, constitutionally void conduct includes, but is not limited to, the following:

a. Pursuing unconstitutional penalties against Plaintiffs.

b. Pursued a civil fraud penalty against Feingold without the required approval.

c. Issued the Unconstitutional Summons to E-Consulting, specifically targeting Feingold's wife.

d. Disclosed Feingold's ***personal health information and financial information to his clients and business associates***.

e. Issued ***eight*** other administrative summonses to various entities associated with Feingold and those close to him to harass Feingold and those close to him. As with the Unconstitutional Summons described herein, the recipients of those summonses filed suit as to each one in federal district court. After which, the Department of Justice got involved and the summonses were quickly withdrawn. The obvious inference from the withdrawals is, of course, that Chatelain's actions were *ultra vires* and constitutionally void.

f. Issued by regular mail a Preliminary Partnership Examination Changes and Imputed Underpayment ("Preliminary Partnership Notice") to E-Consulting purportedly dated October 22, 2026 and demanding a response by October 28, 2026 – just six days after it was purportedly signed. Feingold's wife, however, received the Preliminary Partnership Notice on November 11, 2026. The issuance of the Preliminary Partnership Notice in the first instance shows the blatant disregard Chatelain has for the Government's own procedures and rules. First, a copy was never sent to E-Consulting's representative, Lorne E. Berkeley, Esq., despite Chatelain being in receipt of the Form 2848 Power of Attorney that requires Ms. Chatelain to communicate through Mr. Berkeley and requires her to send him copies of any notices. Second, the six-day response deadline (which includes a weekend) improperly precluded a meaningful response and shows Chatelain's determination to destroy Feingold and those associated with him. More importantly, that Preliminary Partnership Notice asserts an increase to the income of an entity associated with Feingold's wife by $2,222,000 based solely on false assumptions without any effort to verify those assumptions. Through this act, Chatelain again disregarded all standard IRS examination procedures and applicable procedural rules.

g. Seeking entry into Feingold's office (which is located in an office building) by falsely claiming she needed to inspect an airplane despite the obvious fact that an airplane is not located inside Feingold's office (which again is located in an office building).

h. Violating the Fifth Amendment Due Process Rights of non-parties associated with Feingold through false conspiratorial claims that amounts received and reported by non-parties (and upon which they paid taxes) constitute income to Feingold after the expiration of the refund statute of limitations depriving those non-parties of notice and the opportunity to be heard.

i. Seeking to tax Feingold more than once.

j. Ignored the documents provided by Feingold and his companies and instead forced an improper and unnecessarily expensive step of a complete bank reconciliation.

k. Making misleading and false representations of facts to business associates, clients, and the public designed to paint Feingold as a "bad guy".

197. Xi's *ultra vires*, constitutionally void conduct includes, but is not limited to, the following:

a. Pursuing unconstitutional penalties against Plaintiffs.

b. Pursued a civil fraud penalty against Feingold without the required approval.

c. Misrepresented to others that a "Forward Contract Agreement" produced by Plaintiffs did not exist until "more than three years after the purported execution date." The metadata, however, which Xi possesses and avoids referencing, exposes her misrepresentation:







Both the metadata from the Forward Contract Agreement, as well as its annex, show that the document was modified in 2021. The metadata also states that the document was created in 2025 but modified in 2021. A document that was created in 2025 cannot, of course, be modified in 2021. Here, the truth is the obvious: the Forward Contract Agreement was created many years prior to 2025. It is commonly understood that misalignment of metadata is not unusual for older documents that are saved in other locations and resent over time. Such documents can be saved on one computer and then, when re-opened on another computer, exhibit a brand-new creation date. Xi – a senior lawyer for the IRS – should know this. Yet Xi chose to falsely maintain the Forward Contract Agreement was created in 2025 and intentionally withheld the fact that the Forward Contract Agreement matter has already been settled, approved by the Tax Court and paid.

d. Xi further misrepresented to others that Feingold has admitted to hiding a bank account from the IRS. The transcript, however, which Xi possesses but avoids referencing, shows that none of the testimony provided by Feingold is an admission of hiding a bank account from the IRS.

> A So there are people I do business with
> that I have not disclosed various health issues
> that I have.
> I have made a number of transfers with a
> number of entities, and as you sit here you know I
> have probably more than a hundred entities I'm
> involved in, and I intentionally have not updated
> people because I don't want to discuss the
> specifics of my health with them.
> So I don't know the exact dating of
> things, but for estate-planning purposes alone I am
> not the hundred percent owner, I don't believe, of
> any entity that exists right now and so no, that's
> not correct.

Feingold further testified as follows:

> Q Okay. And so at some point you
> controlled MCA Venture One, LLC, and then as a
> result of your estate-planning you may have
> transferred ownership of that entity to other
> individuals?
> A So I don't know that I ever controlled
> that entity because my son decided to drop out of
> college to be with me when he learned I was ill.
> And I took it upon myself to train him to have

> Page 316
>
> certain skills, and that was MCA. I don't know
> that I ever owned that entity. I just don't. I
> would have to see corporate documents. It was --
> it was set up for my son to have a business.
> Q Okay. Do you recall roughly when it was
> set up?
> A I recollect my first diagnosis in 2018,
> so I would expect it would have been after that.

Indeed, Feingold noted that his son dropped out of college to be with him due to personal health issues and that he was training his son to earn a living as he was concerned about his children

having skills to support themselves. Feingold also took steps to legally avoid excess taxes for his family upon his death. Feingold never admitted to hiding a bank account from the IRS and did not do so. Although privy to this information, Xi nevertheless opted to smear Feingold's name, falsely claiming that he admitted to a hidden nominee account. Xi made this false statement to others while in possession of the transcripts. She knew or should have known that her statements were false. Yet she falsely maintains that Feingold admitted to hiding accounts. In response to unlawful subpoenas issued by Xi to two law firms for fees charged to Feingold, the law firms responded that they did not provide legal services to Feingold (which is true). Xi then accused *Feingold* of "fraud" when, in reality, Feingold was required to pay someone else's legal fees and it was thus appropriate for Feingold to list those legal fees as expenses.

e. Violating internal guidelines and protocols for obtaining approval of fraud claim assertions for disinterested supervisors and instead relying on tainted West Palm Beach supervisors that allowed such violations to occur in the first place and ***<u>herself</u>*** (who spearheaded the fraud assertions) to approve such conduct.

f. Seeking to tax Feingold more than once.

g. Violating the Fifth Amendment Due Process Rights of non-parties through conspiratorial claims that amounts received and reported by non-parties (and upon which they paid taxes) constitute income to Feingold after the expiration of the refund statute of limitations depriving those non-parties of notice and the opportunity to be heard.

h. Issuing subpoenas to Feingold's CPA and non-party clients and business associates, imposing extensive burdens on those individuals and companies, disregarding all representations regarding the involvement (or lack thereof) of those non-parties, and stubbornly and intentionally opting to ignore all productions and representations related thereto for the

purpose of dragging out and exacerbating her pursuit because she did not like the answers she was receiving

i. Misrepresenting to others the subpoena responses by non-parties and the compliance efforts made by those non-parties and threatening sanctions based on those misrepresentations.

j. Representing to others that a non-party produced no documents, and that its production was defective, when Xi never downloaded/reviewed the production.

k. Seeking relief and sanctions with respect to an 808,257-page production that Xi later admitted she had never reviewed.

l. Representing to others that she discovered new companies that should have been included on Plaintiffs' tax returns. Besides the fact that the alleged sudden discovery of these companies is false (those companies file federal tax returns), these companies have no bearing on the taxpayers who are the parties: Plaintiffs.

m. Knowingly withholding from others that the falsely claimed "newly discovered" companies are C corporations and, as a matter of federal tax law, would not appear on Plaintiffs' returns. Further, none of these entities were hidden from the IRS—each entity bears a separate EIN (provided by the IRS) and is taxed as a C corporation (the same as the Plaintiff-entities here), and file Form 1120s for the tax years at issue (reporting, to the extent applicable, income and expenses allocated to those entities).

n. Representing to others that she just discovered publicly available SEC litigation involving Feingold that began in 2024 and wrongfully using this purported discovery as a basis to advance her retaliatory agenda against Plaintiffs. The SEC case does not involve this tax controversy. It deals with a multi-billion-dollar land development company for which Feingold

serves as CEO (albeit not until after the years at issue in the Tax Court Case) and no findings or adjudications have been made in that case.

o. Knowingly withheld from others that there are no tax issues raised in the SEC case; rather, it involves securities laws disclosures to individual investors involving a real estate development firm being overseen by a corporate monitor.

p. Apparently representing to at least one third party—from whom she unnecessarily sought documents and information—that no privileges, not even attorney-client privilege, are permitted.

q. Apparently representing to an attorney for a third party that the attorney made himself a witness by merely demanding that Xi follow the proper procedure in serving requests for documents and information on his client (so that proper, timely objections could be made).

r. Asserting that the IRS needs further documents and information as to DP1. DP1, however, has already been identified as the name of a portfolio that another entity (not Plaintiffs) received. DP1 is not an entity. Nonetheless, Xi continues to represent otherwise to others (including the Tax Court).

s. Asserting that the IRS needs further discovery as to a company known as JDS Partners when, in fact, Plaintiffs are not even 1099 recipients of said entity and inclusion of that entity is thus impossible.

t. Seeking to bring new claims involving entities for which the statute of limitations has long expired in an attempt to conduct a courtroom audit of these separate taxable entities and justify a double-taxation whipsaw (again) to inflate the tax liabilities at issue.

u. Representing to a tax court that Shapiro is unavailable on dates that Shapiro himself advised he is available.

v. Demanding that Shapiro respond to unlawful and untimely requests for documents and information. In addition, when Shapiro's attorney stated to Xi that he needed to review it, she further retaliated and issued a demand to interview Shapiro even though any such interview should have been conducted before the issuance of a deficiency notice.

w. Demanding that non-parties turn over 1099s for C corporations and representing that they are required to be given to her. Taxpayers, however, are not required to have 1099s for C corporations. Xi again demanded compliance with a standard unsupported by law.

x. Xi falsely asserted in writing that Feingold prepared certain legal filings instead of his counsel (who signed and submitted the documents) in the Tax Court Case.

y. Making misleading and false representations of facts to business associates, clients, and the public designed to paint Feingold as a "bad guy".

198. All conditions precedent to bringing this action have been satisfied, waived or rendered unnecessary due to futility.

## FIRST CAUSE OF ACTION
## (Declaratory Judgment – Tax Court and Its Judges are Part of the Executive Branch)

199. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

200. The Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure grant this Court authority to declare Plaintiffs' legal rights when an actual controversy exists between the parties.

201. As stated herein above, Plaintiffs and the Government have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S.C. § 2201.

202. Enforcement of the tax laws is an executive function.

203. The Tax Court enforces the tax laws.

204. Moreover, the Tax Court is not in the Legislative Branch.

205. Nor is the Tax Court part of the Judicial Branch.

206. The Tax Court must be part of one of the three Branches of the tripartite Government.

207. For these reasons and for those reasons discussed extensively above, the Tax Court and its judges are part of the Executive Branch of the Government.

208. For the above-described reasons, Plaintiffs respectfully request this Court declare that the Tax Court and its judges are part of the Executive Branch of the Government.

## SECOND CAUSE OF ACTION
**(Declaratory Judgment – The Tax Court Is Not an Impartial and Disinterested Tribunal)**

209. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

210. The Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure grant this Court authority to declare Plaintiffs' legal rights when an actual controversy exists between the parties.

211. As stated herein above, Plaintiffs and the Government have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S.C. § 2201.

212. Because Tax Court proceedings are adjudicated by the Executive Branch against the IRS, which is also part of the Executive Branch, Tax Court proceedings are inherently biased.

213. At minimum, by its very structure, Tax Court judges have a "possible temptation" of ruling in favor of the IRS in order to raise more revenue for the Government and to appease the President who holds the power to remove them at will following the Supreme Court's logic in *Trump v. Slaughter*.

214. This structure creates, at minimum, a *potential for bias* against taxpayers, which is constitutionally intolerable.

215. Under applicable law, the Tax Court is, therefore, not an impartial and disinterested tribunal.

216. For the above-described reasons, Plaintiffs respectfully request this Court declare that the Tax Court is not an impartial and disinterested tribunal.

**THIRD CAUSE OF ACTION**
**(Violations of the Fifth Amendment – Violations of Plaintiffs' Constitutional Rights to Procedural Due Process)**

217. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

218. The Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure grant this Court authority to declare Plaintiffs' legal rights when an actual controversy exists between the parties.

219. As stated herein above, Plaintiffs and the Government have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S.C. § 2201.

220. The Fifth Amendment of the United States Constitution protects against the deprivation of life, liberty or property without due process of law.

221. The Due Process Clause of the U.S. Constitution entitles a person to an impartial and disinterested tribunal.

222. The Government unlawfully deprived Plaintiffs of their Fifth Amendment rights to an impartial and disinterested tribunal because the Tax Court Case is being litigated in Tax Court, which is part of the Executive Branch and is not a neutral adjudicator.

223. First, Tax Court judges exercise "governmental power" and are executive officers subject to Presidential at-will removal.

224. Particularly following *Trump v. Slaughter*, any officer exercising executive power, including Tax Court judges, must be removable at will by the President.

225. Accordingly, Tax Court judges are subordinate to the President.

226. For the reasons discussed herein, the Tax Court is part of the Executive Branch.

227. The IRS is also part of the Executive Branch.

228. In Tax Court proceedings, because both Tax Court judges and the IRS are within the same Executive branch and answerable to the same President, Tax Court judges are not "neutral adjudicators" as required by the Fifth Amendment's Due Process Clause.

229. At minimum, there is a *possible temptation* or *possibility of bias* against taxpayers such as Plaintiffs here, which is constitutionally intolerable.

230. Plaintiffs here are currently litigating against the IRS regarding their alleged tax liabilities in the Tax Court Case in the Tax Court.

231. In other words, Plaintiffs here face the IRS—an Executive Branch agency—in a forum adjudicated by a member of the Executive Branch, i.e., a Tax Court judge.

232. By litigating the Tax Court Case in the Tax Court, Plaintiffs' rights to an impartial and disinterested tribunal have been violated.

233. Regardless of the outcome of the Tax Court Case, Plaintiffs' rights have been violated by even having to litigate in this unconstitutional forum of the Tax Court in front of biased or potentially biased adjudicators, i.e., Tax Court judges.

234. For the above-described reasons, Plaintiffs respectfully request this Court declare that having Plaintiffs litigate their case against the IRS in the biased Tax Court violates Plaintiffs' rights under the Fifth Amendment.

## FOURTH CAUSE OF ACTION
**(Declaratory Judgment)**

235. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

236. The Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure grant this Court authority to declare Plaintiffs' legal rights when an actual controversy exists between the parties.

237. As stated herein above, Plaintiffs and the Government have adverse legal interests that are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment in accordance with 28 U.S.C. § 2201.

238. 26 U.S.C. § 7443(f) provides that Tax Court judges may only be removed by the President "after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause."

239. That is, 26 U.S.C. § 7443(f) does not provide that the President may remove Tax Court judges at will.

240. However, the reasoning of *Trump v. Slaughter* establishes that Tax Court judges must be removable at will by the President as the Tax Court is part of the Executive Branch.

241. Tax Court judges exercise "governmental power."

242. Accordingly, 26 U.S.C. § 7443(f) must provide that Tax Court judges are removable by the President at will, but it does not.

243. Therefore, to the extent 26 U.S.C. § 7443(f) does not provide the President with at-will removal power of Tax Court judges, 26 U.S.C. § 7443(f) is unconstitutional.

244. For the above reasons, Plaintiffs request that this Court declare that 26 U.S.C. § 7443(f) is unconstitutional to the extent that it limits the President's at-will removal power of Tax Court judges.

**FIFTH CAUSE OF ACTION**
**(Specific Relief Against Xi)**

245. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

246. Xi, as laid out above, took constitutionally void, *ultra vires* actions against Feingold, his companies, his family, their business and his clients.

247. Xi's actions go beyond the authority bestowed upon her by her role as an employee of the federal government and beyond any statutory authority afforded Treasury, the IRS, the Office of Chief Counsel, or her role within the Office of Chief Counsel.

248. Under *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 689-91 (1949) and its progeny, sovereign immunity does not apply and Plaintiffs are entitled to specific relief from Xi's actions.

## SIXTH CAUSE OF ACTION
**(Specific Relief Against Chatelain)**

249. Plaintiffs re-allege and incorporate by reference here the allegations in paragraphs 1-198.

250. Chatelain, as laid out above, took constitutional void, *ultra vires* actions against Feingold, his companies, his family, their business and his clients.

251. Chatelain's actions go beyond the authority bestowed upon her by her role as an employee of the federal government and beyond any statutory authority afforded Treasury, the IRS, or her role within the IRS.

252. Under *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 689-91 (1949) and its progeny, sovereign immunity does not apply, and Plaintiffs are entitled to specific relief from Chatelain's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court provide the following relief:

1. Enter judgment declaring that the Tax Court and its judges are part of the Executive Branch;

2. Enter judgment declaring that the Tax Court is not an impartial and disinterested tribunal;

3. Enter judgment declaring that the Government has violated Plaintiffs' rights under the Fifth Amendment;

4. Enter judgment declaring that the Tax Court Case against Plaintiffs in the Tax Court is unconstitutional and illegitimate;

5. Permanently enjoin the Tax Court Case;

6. Require the Government to provide an alternative forum for the IRS and Plaintiffs to litigate their tax dispute in an impartial and disinterested tribunal;

7. Enter judgment declaring that 26 U.S.C. § 7443(f) is unconstitutional to the extent that it limits the President's at-will removal power of Tax Court judges;

8. Enter judgment awarding specific relief against Xi;

9. Enter judgment awarding specific relief against Chatelain;

10. Award Plaintiffs attorneys' fees, expenses, costs and pre- and post-judgment interest as allowed by law; and

11. Any such other relief in Plaintiffs' favor as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

[***signature page follows***]

Dated: November 16, 2026

Respectfully submitted,

**BERKELEY LAW P.A.**

By: ***Lorne E. Berkeley***
Lorne E. Berkeley
Florida Bar No. 146099
10600 Griffin Road, Suite 104
Cooper City, Florida 33328
Telephone: (954) 719-3484
Lorne@BerkeleyLawFL.com

**GALLIVAN WHITE & BOYD P.A.**

Ioannis (Ian) G. Conits*
Austin P. Booth
Florida Bar No. 1049907
55 Beattie Pl., Suite 1200
Greenville, South Carolina 29601
Telephone: 864-271-5432
iconits@gwblawfirm.com
abooth@gwblawfirm.com

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

Irwin Weltz*
1 Old Country Road, Suite 275
Carle Place, New York 11514
Telephone: (212) 202-3176
Facsimile: (516) 855-8776
irwin@weltz.law

**MAYNARD NEXSEN PC**

Andrew A. Mathias*
Konstantine P. Diamaduros*
104 South Main Street, Suite 900
Greenville, SC 29601
Telephone: 864.370.2211
Facsimile: 864.282.1177
AMathias@maynardnexsen.com
KDiamaduros@maynardnexsen.com

*Attorneys for Plaintiffs*

* *Pro hac vice* application forthcoming